**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF VIRGINIA**
Alexandria Division

| | |
|---|---|
| In re: ) | |
| ) | |
| BLUE RIDGE LIMOUSINE AND TOUR ) | |
| SERVICE, Inc. ) | Case No. 12-17551-BFK |
| ) | Chapter 11 |
| Debtor ) | |

**MEMORANDUM OPINION**

This matter comes before the Court on the Final Application for Compensation of Matt Sipos as Financial Consultant for the Debtor in Possession. Docket No. 257. The U.S. Trustee has filed an Objection and a Motion to Disgorge Mr. Sipos's fees. Docket No. 298. The Court heard the evidence and the arguments of the parties on July 11, 2014. Docket No. 327. For the reasons stated below, the Court will allow Mr. Sipos's compensation in the amounts requested, subject only to a possible motion by the Chapter 7 Trustee for a disgorgement based on administrative insolvency.

**Findings of Fact**

Having heard the evidence, the Court makes the following findings of fact:

*A. The Blue Ridge Bankruptcy Case and the Approval of Mr. Sipos's Employment.*

1. Blue Ridge Limousine filed a Voluntary Petition under Chapter 11 with this Court on December 31, 2012. Docket No. 1. Blue Ridge was in the transportation business, primarily through government contracts under which Blue Ridge would operate shuttle buses to drive government employees and contractors between buildings and to and from the Metro.

2. At the time of the filing, Action Capital was the Debtor's primary secured lender.

1

3. On February 4, 2013, the Debtor filed a Motion to Authorize the employment of Mr. Sipos as the Debtor's Financial Consultant. Docket No. 72. The Motion had attached as Exhibit A Mr. Sipos's Consulting Agreement. *Id.*, Ex. A.

4. Mr. Sipos's Consulting Service Agreement provided for compensation in the amount of $1,000 per week, plus expenses. *Id.*

5. The Agreement expressly provides that: (a) Mr. Sipos "will provide to Action [Capital] all invoices that should be removed from Action's books[;]" and (b) Mr. Sipos would review operating agreements, leases and contracts "to determine suitability and [to] advice [sic] Action and BLUE RIDGE of any changes required to maximize value to stakeholders." *Id.*, ¶¶ 1(f), 1(g).

6. The Agreement also provided that it would "remain in full force and effect until terminated by Action." *Id.*, ¶ 4.

7. On March 8, 2013, the Court entered an Order authorizing Mr. Sipos's employment as Financial Advisor to the Debtor. Docket No. 88. The Order provided that it was nunc pro tunc, to the petition date. *Id.* The Order further provided, in part:

> ORDERED, that the arrangements for compensation reached between the Debtor and Mr. Sipos are reasonable based upon the nature, extent and value of such services, the time spent on such services, and the cost of comparable services other than in a case under chapter 11 of the Bankruptcy Code, and because any reimbursement of expenses will be for actual and necessary costs, not exceeding out-of-pocket outlays; and it is further
>
> ORDERED, that Mr. Sipos' compensation shall be subject to all provisions of the Bankruptcy Code regulating the fairness and reasonable worth of services rendered by professionals seeking and receiving compensation; and it is further
>
> ORDERED, that the Debtor may pay to Mr. Sipos on a weekly basis without formal application to the Court 100% of the interim post-petition fees and disbursements pursuant to the Agreement subject to final allowance by the Court upon proper application with notice as required by the Bankruptcy Rules[.]

Order, 3/8/2013, Docket No. 88, p. 2.

8.    In August 2013, the focus of the case changed, from a business in which Blue Ridge was a stand-alone entity with its own government contracts, to a business in which Blue Ridge was essentially acting as a middleman or a broker between the government and the parties who were actually handling the transportation responsibilities.[1]

9.    On January 6, 2014, roughly a year into in the case, the U.S. Trustee filed a Motion to Convert the case to Chapter 7. Docket No. 234.

10.    The case was converted to Chapter 7 on February 19, 2014. Docket No. 250.

B. *Mr. Sipos's Connections with Action Capital.*

11.    Mr. Sipos has a B.S. in finance. He has taken courses for an M.B.A., but has not completed his M.B.A. He is a financial consultant and works as a Chief Financial Officer (CFO) or a temporary Chief Financial Officer for companies that are in the process of restructuring.

12.    Mr. Sipos worked with Action Capital on one previous occasion, in the Knight Protective Services case. In that case, the law firm of Whiteford Taylor & Preston ("WTP") was counsel for the debtor (or counsel for Joel Sher, who was the Chapter 11 Trustee in the case).

---

[1] This change in the Debtor's business strategy resulted in the filing of a series of motions for the approval of subcontracts with parties such as Dulles Luxury Coach. *See* Docket No. 181 (Motion to Approve Subcontract with Dulles Luxury Coach, LLC). It also required the Debtor to sell its vehicles to the subcontracting parties. *See* Docket No. 203 (Motion to Sell Certain Vehicles). Surprisingly, one such motion drew an Objection from a party claiming a perfected lien in the same vehicles, Dakota Financial, LLC, which claimed never to have had notice of the bankruptcy filing. Docket No. 211. The Debtor later consented to relief from the automatic stay with respect to these vehicles, and withdrew the Motion to Sell. Docket Nos. 229, 237. This episode may have been reflective of the poor condition of the Debtor's books and records before the time period when Mr. Sipos was employed, as more fully discussed below.

3

13. Mr. Sipos received a call from Neil Jefferson, the Debtor's president, for the engagement in this case. Mr. Jefferson advised Mr. Sipos during the call that he had been recommended by Action Capital.

*C. Mr. Sipos's Performance as Financial Advisor During the Chapter 11 Case.*

14. Mr. Sipos understood from the outset that he would be required to provide Action Capital with accurate financial reporting. He was required to submit weekly invoices to Action Capital. He attended meetings with Mr. Jefferson, once or twice a week for 6 to 8 hours. He testified that he was on the phone daily with Mr. Jefferson. He worked on responses to requests for proposals for the Debtor. He advised Mr. Jefferson on which contracts were profitable, and which contracts were not profitable and needed to be jettisoned. In all, he testified, he was probably working 20 hours per week on the engagement.

15. From the outset, Mr. Sipos understood that Blue Ridge was "out of balance" with Action Capital, meaning that Blue Ridge had exceeded the applicable lending formulas in its secured credit agreement with Action Capital. Mr. Sipos prepared six week cash flow projections for Blue Ridge. He also recommended that Mr. Jefferson engage a bankruptcy attorney, and recommended Steven Fruin of the law firm of Whiteford, Taylor and Preston ("WTP"), who was selected as counsel for the Debtor in Possession in the case.

16. As CFO, Mr. Sipos worked with the Debtor's accounting and payroll manager. The previous bookkeeper, Nora Solomon used QuickBooks to maintain the Debtor's books and records. Mr. Sipos understood from the outset that there were questions of accuracy of the QuickBooks entries. The company's bank statements had not been reconciled for some period of

4

time, and substantial non-sufficient funds (NSF) fees were being charged to the Debtor's bank account.

17. In reviewing the Debtor's contracts, Mr. Sipos broke down each contract in terms of expected revenue and expenses, to determine whether or not each contract could be made profitable. If not, he advised Mr. Jefferson to see if he could request an increase, or failing that, whether the contract could be terminated.

18. Mr. Sipos testified that he is not a C.P.A., and he does not prepare tax returns. He attempted to reconcile the bank statements, so that a return could be filed. When he was engaged by Blue Ridge, the company owed its C.P.A. $5,000 to $6,000, and the accountant refused to prepare the company's tax returns for 2012. Mr. Sipos further testified that the 2011 tax returns were not accurate, owing to the inaccuracies in the QuickBooks entries.

19. He also prepared invoices between Blue Ridge and its subcontractors (for example, Dulles Luxury Coach). He testified that this was necessary in order to obtain a release of funds from Action Capital for the Debtor.

20. Mr. Sipos also assisted in the preparation of the Debtor's monthly operating reports.

21. Mr. Sipos's employment ended on December 20, 2013. He was paid $1,000 per week for 50 weeks while he was the acting CFO.

22. Mr. Sipos testified that his normal hourly rate was $150 to $250, and that he was sure that he lost money on this engagement, when measured against his hourly rate (in his words, "I was severely underpaid").

*D. The Likelihood of an Administrative Insolvency in this Case.*

23.  Ms. Kindred, the Chapter 7 Trustee, also testified. To date she has collected a little over $70,000, consisting of $30,000 from the sale of the Debtor's remaining contracts and $47,000 that was turned over by Action Capital. She testified that there probably will not be much in the way of preference recoveries.

24.  Ms. Kindred also testified that there are Chapter 7 administrative fees in the amount of approximately $23,000. She testified that there is a total of $196,000 in Chapter 11 administrative expenses, of which $96,000 has not been paid.

25.  In Ms. Kindred's view, the case is administratively insolvent for the Chapter 11 administrative claimants.

## Conclusions of Law

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Order of Reference of the U.S. District Court for this District entered August 15, 1984. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) (matters concerning the administration of the estate) and (B) (allowance or disallowance of claims against the estate).

The U.S. Trustee raises three arguments in opposition to Mr. Sipos's Final Application for Compensation. First, the U.S. Trustee argues that the disclosures in Mr. Sipos's Application for Employment were inadequate under Bankruptcy Rule 2014(a). Second, the U.S. Trustee argues that Mr. Sipos's fees are not reasonable under Bankruptcy Code Section 330(a) (the court may order "reasonable compensation for actual, necessary services rendered"). Third and finally, the U.S. Trustee argues that the Court should not award Mr. Sipos final compensation in the face

6

of what likely will be an administrative insolvency in this case. The Court will address each objection, in turn.

### I.     The Adequacy of the Disclosures Under Bankruptcy Rule 2014.

The U.S. Trustee actually raises two issues in connection with the adequacy of the disclosures in Mr. Sipos's Application for Employment. First, she argues that Mr. Sipos's "connections" with Action Capital were not adequately disclosed under Rule 2014(a). Second, she argues that Mr. Sipos had an impermissible conflict of interest, in that he had reporting duties to Action Capital. The Court will address each of these issues.

*A.  Mr. Sipos's Alleged Undisclosed Connections with Action Capital.*

Rule 2014(a) requires that professionals to be employed by the estate disclose "to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States Trustee, or any person employed in the office of the United States Trustee." Fed. R. Bankr. P. 2014(a). Bankruptcy Rule 2014(a) disclosure is not optional; it is mandatory. *See id.* ("The application *shall* be filed. . . .") (emphasis added). Professionals should always err, if at all, on the side of disclosure; the professional may not choose to withhold the disclosure of a connection on the ground that, in the professional's view, there is no interest that is adverse to the estate. *In re Fibermark, Inc.*, 2006 WL 723495, at *10 (Bankr. D. Vt. 2006) ("the applicant should err on the side of caution"); *In re E-Toys*, 331 B.R. 176, 190 (Bankr. D. Del. 2005) ("Bankruptcy Rule 2014 requires that the attorney seeking employment disclose to the Court *all* connections with the parties in interest in the case, rather than furnishing only those which appear to implicate 'disinterestedness' or 'adverse interest' concerns under section 327(a)"); *In re Filene's*

7

*Basement, Inc.*, 239 B.R. 850, 856 (Bankr. D. Mass. 1999); *In re Leslie Fay Cos., Inc.*, 175 B.R. 525, 533 (Bankr. S.D.N.Y. 1994).

Still, the Rule does not define the term "connections." The term has been the subject of some discussion in the recent case law. In *E-Toys*, the court was confronted with the relationship between the debtor's financial advisor, Mr. Gold, who was brought in to liquidate the remaining assets of the debtor, and the law firm for the Official Committee of Unsecured Creditors, Traub, Bonaquist, Fox, LLP. When it became clear that the debtor's senior management would not remain with the company, Traub Bonaquist recommended Mr. Gold for the position of president and chief executive officer. The court found that there were undisclosed conflicts of interest, in that Mr. Gold: (a) had an arrangement whereby he was being paid $30,000 per month through a company known as ADA, in which Mr. Gold and Mr. Traub each had a 50% interest; and (b) Mr. Gold was working on other engagements with the Traub Bonaquist firm, at the same time he was being hired as the debtor's CEO in the E-Toys case.

The court in *E-Toys* noted: "It is not unusual for professionals and turnaround specialists to work on the same cases. In fact, given the specialized nature of the bankruptcy practice, it is inevitable." 331 B.R. at 195. In the end, the court declined to sanction Mr. Gold finding that "the evidence fails to establish any actual conflict of interest held by Gold that caused any harm to the estate." *Id*. at 202. The Court did, however, approve a settlement between the U.S. Trustee and the Traub Bonaquist firm in which the firm agreed to disgorge $750,000 (which represented 50% of the total post-petition, pre-confirmation fees earned by the firm). *Id*. at 198.[2]

---

[2]  The court in *E-Toys* also noted that it agreed "with those courts that conclude that an officer is not a professional who needs to be retained by the debtor under section 327(a)." *Id*. at 201. In this case, Mr. Sipos was engaged as a financial advisor, pursuant to Section 327(a). *See* Application for Employment, Docket No. 72. This Court is of the

8

In *Fibermark*, the court also was faced with allegations of undisclosed connections on the part of a financial advisor to the estate. Chanin Capital Partners, LLC, was engaged as the financial advisor to the Creditors Committee. It was not disputed that Chanin was acting as the financial advisor in other bankruptcy cases in which the members of the Creditors Committee were committee members in the other cases, and in which counsel for the debtor or the Committee appeared as counsel in the other cases. The court noted: "It is quite typical for a bankruptcy professional who works primarily in chapter 11 cases to have dealt with other bankruptcy professionals in any particular case, on many previous occasions." 2006 WL 723495, at *11. The court held:

> The Court further finds that Rule 2014 does require professionals appointed in chapter 11 cases to disclose all connections with the debtor, creditors, any other party in interest, as well as the attorneys and accountants for such parties. However, the extent and format of such disclosures may vary from case to case, as the circumstances of each case will define the "connections" that must be disclosed to provide the Court and parties in interest with sufficient information to determine whether the applicant is disinterested. Moreover, any determination of the sufficiency of the disclosures produced pursuant to Rule 2014 should be made by balancing the plain language of the rule's mandate that applicants disclose "all connections," in order to maintain integrity of the professional appointment process in bankruptcy cases, against the common sense analysis of what connections are reasonably defined as pertinent to the ultimate question of disinterestedness, so that competent professionals do not find the requirements of representing parties in bankruptcy cases so burdensome as to deter them from doing so.

*Id*.

Finally, in the more recent case of *KLG Gates, LLP v. Brown*, 506 B.R. 177 (E.D.N.Y. 2014), the court also addressed the issue of connections under Rule 2014. There, the court, relying on *Fibermark*, found that the failure to disclose an individual attorney's past professional

---

view that financial advisors are professionals whose employment needs to be approved under Section 327. *In re Copenhaver, Inc.,* 506 B.R. 757, 762 (Bankr. C.D. Ill. 2014).

relationships with counsel for certain other parties (known as the "Brown Insiders") was not a violation of Rule 2014. 506 B.R. at 195. The court went on to rule that, absent prior judicial notice that such disclosures would be required, "sanctioning KLG for these non-disclosures would implicate due process concerns and that this type of 'ambush [would] serve no legitimate purpose.'" *Id*. (quoting *Fibermark*, 2006 WL 723495, at * 11).

In this case, Action Capital recommended that the Debtor hire Mr. Sipos, but it did not direct his employment to the exclusion of any other financial advisor. Mr. Sipos had worked with Action Capital and WTP in one prior case. The fact that he was recommended by Action Capital for the engagement in this case, in the Court's view, is simply not a "connection" within the meaning of Rule 2014(a). Similarly, the fact that Mr. Sipos worked with WTP in a previous case is not a connection that is required to be disclosed. At the time of his Rule 2014 Statement, Mr. Sipos had no financial transactions ongoing with Action Capital or WTP (as did the financial advisor in *E-Toys*). He simply knew them from a prior case. He was not simultaneously engaged in any other bankruptcy cases in which Action Capital was a party, or in which WTP was counsel. Without diminishing the unquestioned need for prompt, voluntary and complete disclosure under Rule 2014(a), the Court finds that Mr. Sipos's connections with Action Capital and with WTP are not of the kind that needed to be disclosed in his Application for Employment.

    B.  *Alleged Duties to Action Capital.*

Mr. Sipos's Consulting Service Agreement contains certain reporting requirements to Action Capital. *See* Docket No. 72, Consulting Service Agreement, ¶¶ 1(f), 1(g). These kinds of reporting requirements, though, are not unusual and do not constitute an impermissible conflict of interest. Secured lenders, for their part, often may require these kinds of reporting provisions

10

in order to effectively monitor their collateral. As long as the financial professional retains objectivity and understands that his or her fiduciary duties remain with the bankruptcy estate and not to the secured lender, these kinds of reporting requirements are not impermissible.[3]

The Agreement also provides: "The Term of this Agreement will begin on the date of this Agreement and will remain in full force and effect until terminated by Action." Consulting Services Agreement, ¶ 4. Mr. Sipos testified that, in his view, this provision effectively required Action's consent to a successor financial advisor, if he were replaced by the Debtor. The Court accepts Mr. Sipos's view of the Agreement. Further, Action Capital did not in fact act to terminate Mr. Sipos. Mr. Sipos's engagement as the Debtor's financial advisor came to end effectively when the case was converted to Chapter 7.

In the end, the Court is satisfied that Mr. Sipos recognized that his fiduciary duties ran to the bankruptcy estate and not to Action Capital. The Court will not deny or diminish Mr. Sipos's compensation on the basis of a conflict of interest with Action Capital.

## II. The Reasonableness of the Compensation Sought.

The U.S. Trustee objects to the reasonableness of Mr. Sipos's compensation under Section 330(a). She argues primarily that Mr. Sipos's failure to keep contemporaneous time records of the hours spent on the engagement now precludes the Court from making any assessment of the reasonableness of his fees, and that the Court should disallow his compensation.

---

[3] The Court also is satisfied that these reporting requirements were adequately disclosed in Mr. Sipos's Application for Employment. The Consulting Service Agreement was attached to the Application as an Exhibit. The Agreement itself is five pages. The Court agrees with the U.S. Trustee as a general proposition that neither the Court nor the U.S. Trustee should be required to ferret out conflicts or connections. The alleged connections in this case, though, were in fact disclosed in an attachment to the Application.

11

Mr. Sipos, on the other hand, argues that he generally does not keep contemporaneous time records, and that no one advised him that he needed to keep time records.

Bankruptcy Code Section 330(a)(3) requires the Court to consider the following factors in assessing the reasonableness of professional compensation:

> In determining the amount of reasonable compensation to be awarded to an examiner, trustee under chapter 11, or professional person, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including—
>
> (A) the time spent on such services;
>
> (B) the rates charged for such services;
>
> (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
>
> (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;
>
> (E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and
>
> (F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3).

While it certainly would have been the better practice for Mr. Sipos to keep contemporaneous time records, his engagement as the Debtor's financial advisor in this case did not require that he keep such records. Mr. Sipos's Consulting Service Agreement called for him to be paid $1,000 per week, regardless of the number of hours that he spent (of course, the reasonableness standard still applies – if the evidence showed that Mr. Sipos spent an hour or

12

two a month on the engagement, then his compensation of $1,000 a week would have been unreasonable). Section 328(a) of the Code provides as follows:

> The trustee, or a committee appointed under section 1102 of this title, with the court's approval, may employ or authorize the employment of a professional person under section 327 or 1103 of this title, as the case may be, on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis. Notwithstanding such terms and conditions, the court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions.

11 U.S.C. § 328(a).

The Court approved this arrangement (with the U.S. Trustee's endorsement). Mr. Sipos testified that he spent 6 to 8 hours, 1 to 2 days a week. Assuming the lower figures, 6 hours of Mr. Sipos's time 1 day a week, this equates to 24 hours a month. At Mr. Sipos's lower hourly rate of $150, this would equate to $900 per week in professional fees. At the higher numbers – 8 hours a day, 2 days a week – this would mean that he could have charged $2,400 per week (using $150 per hour) and $4,000 using the higher hourly rate of $250. The Court can only conclude that Mr. Sipos's weekly rate of $1,000 was a bargain for the estate. Viewed under Section 328(a), the Court cannot say in hindsight that the employment of Mr. Sipos at a rate of $1,000 per week was improvident in light of later developments.[4]

The U.S. Trustee also relies on the fact that the company's tax returns were not completed, in support of her objection to Mr. Sipos's fees. The Court, though, accepts Mr.

---

[4] The Court notes that this was a Chapter 11 estate of fairly modest assets from the outset. The Court would expect financial advisors to keep contemporaneous time records in a case of any complexity. *See In re Commercial Fin. Servs., Inc.,* 298 B.R. 733, 752 (10th Cir. B.A.P. 2003) ("Houlihan, an established professional participant in bankruptcy cases, must have been aware of the bankruptcy court's duty under § 330(a) to allow only 'reasonable compensation,' and that reasonableness may be evaluated by looking at the amount of compensation requested and the time spent on the cases.")

13

Sipos's testimony that he was not responsible for completing the tax returns; rather, he was responsible for getting accurate information to the accountant so that the accountant could prepare the tax returns. The Court finds that Mr. Sipos did what he was required to do in order for the tax returns to be prepared and filed.

Having heard Mr. Sipos's testimony, the Court finds that the requested compensation of $1,000 per week is reasonable.

### III.    The Likelihood of an Administrative Insolvency in this Case.

Finally, the U.S. Trustee argues that Mr. Sipos's compensation should not be allowed (or, more accurately, that the compensation that he has already been paid should be disgorged) because of the likelihood of an administrative insolvency for the Chapter 11 professionals. Mr. Sipos responds by arguing that he was hired in the ordinary course, relying on such cases as *In re Kearing*, 170 B.R. 1 (Bankr. D.D.C. 1994), and *In re Vernon Sand & Gravel, Inc.*, 109 B.R. 255 (Bankr. N.D. Ohio 1989) for the proposition that disgorgement should not be ordered from ordinary course creditors.

Disgorgement is a harsh remedy, one that should be used sparingly. *In re LTV Steel Co.*, 288 B.R. 775 (Bankr. N.D. Ohio 2000). The principal that the Court should refrain from ordering a disgorgement of ordinary course expenses paid during the course of a Chapter 11 case is reflective of the policy concern that firms should be able to do business with Chapter 11 debtors without the fear of later having to disgorge what was paid to them. This inevitably would have the result of driving up the prices of goods and services provided to Chapter 11 estates because there would be more risk associated with doing so. There is a distinction to be made, however, between ordinary course goods and services and professionals hired by the estate. *See In re*

14

*Livore*, 473 B.R. 864, 869 (Bankr. D.N.J. 2012); *In re Anolik*, 207 B.R. 34, 40 (Bankr. D. Mass. 1997) ("There is, of course, a rational basis for treating the claims of professionals differently from those of some non-professionals. It is inequitable to order disgorgement of payments made to trade creditors and other similarly situated parties 'in the ordinary course of business' of a Chapter 11 case. 'The alternative would make it impossible for any prudent business person to voluntarily do business, even on a cash basis, with a chapter 11 debtor.'") (quoting *In re Manwell*, 62 B.R. 533, 534 (Bankr. N.D. Ind. 1986)); *In re Lochmiller Industries, Inc.,* 178 B.R. 241, 247 (Bankr. S.D. Cal. 1995); *In re Metropolitan Elec. Supply Corp.,* 185 B.R. 505 (Bankr. E.D. Va. 1995); *Guinee v. Toombs (In re Kearing),* 170 B.R. 1, 7–8 (Bankr. D.D.C. 1994) ("the court need not be concerned that disgorgement of professional fees would render debtors unable to retain employees, hire service providers or maintain accounts on the basis that those entities would fear that the money they receive would be subject to disgorgement. Professionals seeking compensation from the bankruptcy estate do so at the risk that the estate will not have sufficient funds to satisfy their claims.")

Here, Mr. Sipos was employed pursuant to Section 327(a) as a professional of the estate. His employment was not in the ordinary course – Blue Ridge Limousine was in need of a financial advisor because it was insolvent, which hardly can be characterized as an ordinary course of business transaction. His compensation, therefore, is subject to disgorgement (or partial disgorgement) in the event of an administrative insolvency.

The Chapter 7 Trustee was clear in her testimony that this case will end up in an administrative insolvency for the Chapter 11 professionals. The extent of the administrative insolvency, though, is unknown at this point. The Trustee does not know how much she will

15

ultimately collect from the Debtor's remaining receivables, nor does she know whether there may be any preference or other avoidance recoveries for the benefit of the estate. The Court will allow Mr. Sipos's fees, subject to a disgorgement motion, should the Chapter 7 Trustee choose to bring such a motion.[5]

### Conclusion

For the foregoing reasons, the Court finds that Mr. Sipos did not fail to disclose relevant connections under Rule 2014(a), nor did he suffer any disabling conflicts of interest with Action Capital under his Consulting Service Agreement. The Court further finds that his fees are reasonable under the circumstances of this case. The Court will allow his compensation as requested, subject to any later disgorgement motion the Chapter 7 Trustee may wish to pursue. The Chapter 7 Trustee need not pay any unfunded portion of Mr. Sipos' allowed fees at this stage of the case. The Court will enter a separate Order allowing his compensation in the amounts requested.

Date: Aug 20 2014

Alexandria, Virginia

/s/ Brian F. Kenney
Brian F. Kenney
United States Bankruptcy Judge
Entered on Docket: August 20, 2014

---

[5] At the hearing, WTP argued that it would surrender a portion of its compensation in order to avoid the prospect of an administrative insolvency, in an effort to protect Mr. Sipos from a disgorgement motion by the Chapter 7 Trustee. It is certainly laudable that the firm feels some responsibility to Mr. Sipos and is willing to relinquish some of its compensation in order to protect Mr. Sipos from the adverse consequences of a disgorgement motion. At present, though, the extent of the administrative insolvency is unknown. Accordingly, the Court finds that this sort of arrangement is better left to a settlement motion under Rule 9019, rather than a factor to consider in the present Application for Compensation and the U.S. Trustee's Motion for Disgorgement of Mr. Sipos's compensation.

Copies to:

Justin Fasano, Esquire
Christopher Jones, Esquire
Whiteford Taylor & Preston, L.L.P.
3190 Fairview Park Drive, Suite 300
Falls Church, VA 22042
Counsel for the Debtors

Klinette H. Kindred, Esquire
Gregory Counts, Esquire
Tyler, Bartl, Ramsdell and Counts
300 N. Washington Street, Suite 202
Alexandria, VA   22314

Bradley David Jones, Esquire
Office of the United States Trustee
115 South Union Street, Suite 210
Alexandria, VA 22314

Matt Sipos, Esquire
200 Carrington Way
Kingsland, GA 31584

John O'Donnell, Jr. , Esquire
601 King Street, 400
Alexandria, VA 22314
Counsel for Matt Sipos, Esquire